[Civ. No. 66030. Second Dist., Div. Two. Dec. 23, 1982.]

CITY OF LOS ANGELES, Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

528

**COUNSEL**

George Deukmejian, Attorney General, R. H. Connett, Assistant Attorney General, and Norman N. Flette, Deputy Attorney General, for Defendants and Appellants.

Ira Reiner, City Attorney, Gary R. Netzer and William B. Burge, Assistant City Attorneys, and Gail Gordon Dade, Deputy City Attorney, for Plaintiff and Respondent.

**OPINION**

**GATES, J.**—The State of California and the State Attorney General appeal from the judgment entered in favor of the City of Los Angeles declaring subdivision (d) of Government Code section 65860 to be "unconstitutional *on its face* for the following reasons: a. It is vague and unintelligible. b. It purports to intrude into matters traditionally reserved to municipalities without any apparent over-riding concern contrary to article XI, section 5 of the California Constitution. c. It is special legislation which fails to meet existing criteria for singling out one municipality for special treatment and legislation, and it discriminates invidiously and unconstitutionally between charter cities in the same county for no legally recognized reason in violation of article IV, section 16(b) of the California Constitution." (Italics added.)[1] As hereinafter appears, we have concluded the judgment should be reversed.

---

[1] It must be stressed from the very outset that, as indicated, this challenged decision was concerned *solely* with the *facial validity* of subdivision (d). As the trial court declared in its findings and conclusions, it had "granted defendants' motion *in limine* excluding any evidence at trial" and, consequently, it had "ruled that only issues of law were involved, [and it would make] no finding of fact."

Over the years the Legislature has enacted a number of statutes as part of the state Planning and Zoning Law (Gov. Code, § 65000 et seq.). As we recently declared, the thrust of the statutory scheme embodied in this law has been to "insure that decisions made by local governmental entities, which affect future growth of their communities, will be the result of considered judgment in which due consideration is given to the various interrelated elements of community life. . . ." (*Bownds* v. *City of Glendale* (1980) 113 Cal.App.3d 875, 880 [170 Cal.Rptr. 362].)

Nonetheless, and notwithstanding the Legislature's declaration that it is "the policy of the state and the intent of the Legislature to protect California's land resource, to insure its preservation and use in ways which are economically and socially desirable in an attempt to improve the quality of life in California" (Gov. Code, § 65030), the decisionmaking power in this area still rests largely with local governmental agencies. In fact, the Legislature has expressly found that "decisions involving the future growth of the state, most of which are made and will continue to be made at the local level, should be guided by an effective planning process, including the local general plan, and should proceed within the framework of officially approved statewide goals and policies directed to land use, population growth and distribution, development, open space, resource preservation and utilization, air and water quality, and other related physical, social and economic development factors." (Gov. Code, § 65030.1.)

With respect to such local general plans, the Legislature has required each county and city, including charter cities, to adopt "a comprehensive, long-term general plan for the physical development of the county or city, and of any land outside its boundaries which in the planning agency's judgment bears relation to its planning." (Gov. Code, §§ 65300, 65700.) The plan is to serve "as a pattern and guide for the orderly physical growth and development and the preservation and conservation of open space land of the county or city and as a basis for the efficient expenditure of [the city's or county's] funds relating to the subjects of the general plan; . . ." (See Gov. Code, § 65400.) The plan must include elements for land use, circulation, housing, conservation, open-space, seismic safety, noise, scenic highways and safety. (Gov. Code, § 65302.)

As to zoning regulations, the Legislature has expressed its intention "to provide for the adoption and administration of zoning laws, ordinances, rules and regulations by counties and cities, as well as to implement such general plan as may be in effect in any such county or city. Except as provided in Article 4 (commencing with Section 65910) and in Section 65913.1, the Legislature declares that in enacting this chapter it is its intention to provide only a minimum of limitation in order that counties and cities may exercise the maximum degree of control over local zoning matters." (Gov. Code, § 65800.) It has further declared that the "provisions of this chapter shall not apply to a

chartered city, except to the extent that the same may be adopted by charter or ordinance of the city." (Gov. Code, § 65803.) An exception to the foregoing exemption for charter cities is section 65860 which provides:

"(a) County or city zoning ordinances shall be consistent with the general plan of the county or city by January 1, 1974. A zoning ordinance shall be consistent with a city or county general plan only if: (i) The city or county has officially adopted such a plan, and (ii) The various land uses authorized by the ordinance are compatible with the objectives, policies, general land uses, and programs specified in such a plan.

"(b) Any resident or property owner within a city or a county, as the case may be, may bring an action in the superior court to enforce compliance with the provisions of subdivision (a). Any such action or proceedings shall be governed by Chapter 2 (commencing with Section 1084) of Title 1 of Part 3 of the Code of Civil Procedure. Any action or proceedings taken pursuant to the provisions of this subdivision shall be taken within 90 days of the enactment of any new zoning ordinance or the amendment of any existing zoning ordinance as to said amendment or amendments.

"(c) In the event that a zoning ordinance becomes inconsistent with a general plan by reason of amendment to such a plan, or to any element of such a plan, such zoning ordinance shall be amended within a reasonable time so that it is consistent with the general plan as amended.

"(d) Notwithstanding Section 65803, this section shall apply in a charter city of 2,000,000 or more population to a zoning ordinance adopted prior to January 1, 1979, which zoning ordinance shall be consistent with the general plan of such city by July 1, 1982."

■ Respondent asserts that subdivision (d) is incapable of "intelligible application" because it applies only to zoning ordinances adopted prior to January 1, 1979. The challenged provision is clearly inartfully drafted and superficially, at least, might be susceptible to such an interpretation. However, rather than interpret the enactment in a manner which would expose it to the charge of unconstitutional vagueness, we construe it in light of the import of section 65860 as a whole. Thus considered, it provides a clear and ascertainable standard.

In 1971, for the first time, a provision requiring zoning ordinances to be consistent with the general plan of the city or county was enacted. (Gov. Code, § 65860, subd. (a).) Effective January 1, 1979, the section's consistency provision was extended to charter cities having a population of at least two million. Affected cities were given until January 1, 1981, to comply with the requirement. "The 1981 compliance date was patterned after the original zoning con-

sistency requirement which gave counties and general law cities two years to conform." (Office of Planning and Research, Legislative Analysis, AB 1639.) Subsequently, the date was extended to July 1, 1982, apparently in recognition of the size of the City of Los Angeles and the budget constraints imposed by Proposition 13.

We construe subdivision (d) to require that *all* ordinances enacted by charter cities having a population of at least 2 million shall be consistent with the cities' general plans. With respect to those ordinances adopted prior to the provision's effective date, conformity shall be achieved by July 1, 1982.

■ By adopting this interpretation, we "conform to the rule that enactments should be interpreted when possible to uphold their validity [citation], and the corollary principle that courts should construe enactments to give specific content to terms that might otherwise be constitutionally vague. [Citations.]" (*Associated Home Builders etc., Inc.* v. *City of Livermore* (1976) 18 Cal.3d 582, 598 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

Article XI, section 5, subdivision (a) of the California Constitution authorizes charter cities to "make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws."

■ Notwithstanding this "home rule" provision, the "general law prevails over local enactments of a chartered city, even in regard to matters which would otherwise be deemed strictly municipal affairs, where the subject of the general law is of statewide concern." (*Professional Fire Fighters, Inc.* v. *City of Los Angeles* (1963) 60 Cal.2d 276, 292 [32 Cal.Rptr. 830, 384 P.2d 158]; *Baggett* v. *Gates* (1982) 32 Cal.3d 128, 136 [185 Cal.Rptr. 232, 649 P.2d 824].) ■ As conditions in the state change, what was once a matter of local concern may later become a matter of statewide concern controlled by general law. (*Pac. Tel. & Tel. Co.* v. *City & County of S.F.* (1959) 51 Cal.2d 766, 771 [336 P.2d 514]; see also *People* ex rel. *Younger* v. *County of El Dorado* (1971) 5 Cal.3d 480, 498 [96 Cal.Rptr. 553, 487 P.2d. 1193].) ■ The resolution of the question whether a particular matter is "strictly" a municipal affair or of statewide concern is a judicial function to be determined upon the facts and circumstances surrounding a given case. (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 62 [81 Cal.Rptr. 465, 460 P.2d 137].) In exercising this function the courts will give great weight to the legislative purpose and those "factors which influenced the Legislature to adopt the general laws may likewise lead the courts to the conclusion that the matter is of statewide rather than merely local concern. . . ." (*Bishop* v. *City of San Jose, supra,* 1 Cal.3d 56, 63.)

As our foregoing summary of the state's land use enactments illustrates, the Legislature has been sensitive to the fact that planning and zoning in the conventional sense have traditionally been deemed municipal affairs. It has thus made no attempt to deprive local governments (chartered city or otherwise) of their right to manage and control such matters, but rather has attempted to impinge upon local control only to the limited degree necessary to further legitimate state interests.

■ The state's interest in requiring *all* counties and cities in California to adopt general plans seems clear-cut and is not challenged by respondent. "The deleterious consequences of haphazard community growth in this state and the need to prevent further random development are evident to even the most casual observer. . . ." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 120 [109 Cal.Rptr. 799, 514 P.2d 111].) Yet, a failure to have a similar requirement for the implementation of these general plans by means such as zoning would once again almost certainly relegate each of them to the status of an " 'interesting study.' " (*City of Santa Ana* v. *City of Garden Grove* (1979) 100 Cal.App.3d 521, 532 [160 Cal.Rptr. 907].) Such a result would subvert the "combined effect" of the State Planning and Zoning Law "which is to require that cities and counties adopt a general plan for the future development, configuration and character of the city or county and require that future land use decisions be made in harmony with that general plan." (*Bownds* v. *City of Glendale, supra,* 113 Cal.App.3d 875, 880.)

■ ". . . There must always be doubt whether a matter which is of concern to both municipalities and the state is of sufficient statewide concern to justify a new legislative intrusion into an area traditionally regarded as 'strictly a municipal affair.' Such doubt, however, 'must be resolved in favor of the legislative authority of the state.' [Citation.]" (*Baggett* v. *Gates, supra,* 32 Cal.3d 128, 140.) ■ We, therefore, conclude that, at least in the absence of any evidence on the subject, the home rule doctrine is inapplicable in the instant case and the general law is paramount.

■ Government Code section 65860, subdivision (d), applies solely to charter cities having a population of at least two million. Apparently only the City of Los Angeles presently falls into this classification. However, that factor alone would not render the enactment invalid.[2] ■ "The Legislature is not

---

[2]Article IV, section 16, subdivision (b) of the California Constitution, specifies that "a local or special statute is invalid if a general statute can be made applicable." This provision has been construed to be the substantial equivalent of the equal protection clause of the Fourteenth Amendment to the United States Constitution. (*Serrano* v. *Priest* (1971) 5 Cal.3d 584, 596, fn. 11 [96 Cal.Rptr. 601, 487 P.2d 1241]; *Durham* v. *City of Los Angeles* (1979) 91 Cal.App.3d 567, 575 [154 Cal.Rptr. 243].)

bound, in order to adopt a constitutionally valid statute, to extend it to all cases which might possibly be reached, but is free to recognize degrees of harm and to confine its regulation to those classes of cases in which the need is deemed to be the most evident. . . ." (*Board of Education* v. *Watson* (1966) 63 Cal.2d 829, 833 [48 Cal.Rptr. 481, 409 P.2d 481].)

"[E]xclusive treatment of public entities on the basis of population is a long-accepted legislative technique of California municipal law. [Citations.]" (*City of Los Angeles* v. *City of Artesia* (1977) 73 Cal.App.3d 450, 456 [140 Cal.Rptr. 684].) There are numerous examples of California statutes that apply to Los Angeles County or City alone, including several statutes enacted as part of the State Planning and Zoning Law. (E.g., Gov. Code, §§ 66474.60-66474.64 relating to subdivisions.) So long as a classification " 'bear[s] some rational relationship to a conceivable legitimate state purpose' " or rests upon " 'some ground of difference having a fair and substantial relation to the object of the legislation,' " the enactment will be upheld. (*Cooper* v. *Bray* (1978) 21 Cal.3d 841, 847-848 [148 Cal.Rptr. 148, 582 P.2d 604], quoting *Newland* v. *Board of Governors* (1977) 19 Cal.3d 705, 711 [139 Cal.Rptr. 620, 566 P.2d 254].)

■■ "Our society is no longer a collection of insular local communities. Communities today are highly interdependent. . . ." (*Baggett* v. *Gates, supra,* 32 Cal.3d 128, 140.) Accordingly, in the absence of any evidence on the subject, we cannot say in the instant case that it would have been irrational for the Legislature to have concluded that, as a result of the probable impact land use decisions by an entity the size of Los Angeles would have on the numerous municipalities that surround it, and that it surrounds, a failure on the part of the city to enact zoning ordinances consistent with its general plan would jeopardize the state's interest in promoting cooperative planning efforts among adjoining muncipalities (Gov. Code, §§ 65305, 65306) and in achieving the orderly and harmonious development of urban areas. (Gov. Code, §§ 65060.1, 65060.2.)

All counties, including Los Angeles County, and all general law cities, including those encompassed by Los Angeles, *already are required to conform* their zoning to their general plans. Furthermore, it appears that even though state zoning laws do not as yet apply to other charter cities, most have adopted similar standards and procedures designed to promote conformity. (Cal. Office of Planning and Research, General Plan Guidelines (Sept. 10, 1980), p. 77.) However, the ability of each of these neighboring entities to fulfill its goal may be pragmatically impossible if the City of Los Angeles need not honor its own design for its future.

We hasten to add, however, that our holding here should not be construed to suggest that we either agree or disagree with the wisdom of the legislative deci-

sion to impose such a burden upon Los Angeles alone, while ignoring the several other charter cities whose joint contribution to the total population of this megalopolis allegedly exceeds that of Los Angeles. Similarly, we confess if we could consider, and accept as correct, the respondent's projections regarding the extraordinary financial costs and disruptive zoning consequences that may result from imposing this task upon it, we would find many of its arguments quite persuasive.[3] In fact, an excellent case could be made for the proposition that the sheer geographical size of Los Angeles, and the myriad divergent land use problems resulting therefrom, should be cause for permitting it *greater, rather than less, flexibility* in the development and augmentation of long-range guidelines, than is afforded to others. (Cf. Lefcoe, *California's Land Planning Requirements: The Case for Deregulation* (1981) 54 So. Cal. L. Rev. 447 with DiMento, *Developing the Consistency Doctrine: The Contribution of the California Courts* (1980) 20 Santa Clara L. Rev. 285; McEwen, *Land-Use Control, Externalities, and the Municipal Affairs Doctrine: A Border Conflict* (1975) 8 Loyola L.A. L. Rev. 432.)

Nonetheless, even if we had before us a record that revealed all the determinative facts, our duties would permit us to inquire only into the propriety, and not the sagacity, of our legislative colleagues' decisions. As we observed in *People* v. *Hill* (1982) 134 Cal.App.3d 1055, 1060 [185 Cal.Rptr. 64], "Our belief in the concept of judicial restraint, and our deference to the powers granted our coequal governmental partners, cannot be limited to those instances where, after viewing the fruits of their labors, we find them good." Here, we can but conclude that the challenged statute is not unconstitutional on its face.

The judgment is reversed.

Compton, Acting P. J., and Beach, J., concurred.

A petition for a rehearing was denied January 11, 1983, and respondent's petition for a hearing by the Supreme Court was denied March 2, 1983. Richardson, J., and Kaus, J., were of the opinion that the petition should be granted.

---

[3]We once again stress, however, that the trial court permitted no evidence to be introduced below to support respondents' assertions and it made no findings of fact whatsoever. (See fn. 1.) Therefore, neither it, nor this court, has had occasion to consider the factual basis for the challenged legislation nor the legality of its implementation.